421 A.2d 1198

Priscilla F. PIEKARSKI, Executrix of the Estate of Francis J. Piekarski, Deceased, on behalf of the Estate of Francis J. Piekarski and on behalf of the next of kin of Francis J. Piekarski

v.

CLUB OVERLOOK ESTATES, INC., Phillip Fratto and Samuel Fratto, t/d/b/a Dino's Bar, Township of Penn, Butler County, Pa., and Latrobe Construction Company.

Appeal of TOWNSHIP OF PENN.

Appeal of CLUB OVERLOOK ESTATES, INC.

Joanne M. PLANZ, Executrix of the Estate of Raymond C. Planz

v.

CLUB OVERLOOK ESTATES, INC., a Pennsylvania Corporation, Phillip and Samuel Fratto, t/d/b/a Dino's Bar, Penn Township, a municipal corporation, Latrobe Construction Company, a Pennsylvania Corporation, and Priscilla Piekarski, Admrx. of the Estate of Francis Piekarski.

Appeal of TOWNSHIP OF PENN.

Appeal of CLUB OVERLOOK ESTATES, INC.

Superior Court of Pennsylvania.

Argued Nov. 13, 1979.

Filed Sept. 12, 1980.

Petition for Allowance of Appeal Denied Feb. 27, 1981.

164

R. Kenneth Willman, Pittsburgh, for Township of Penn, appellant at Nos. 1390 and 1391.

Charles E. Evans, Pittsburgh, for Piekarski, appellee at nos. 1390 and 102.

Gerald W. Weaver, Pittsburgh, for Club Overlook Estates, appellant at nos. 102 and 103.

James E. McLaughlin, Pittsburgh, for Fratto, appellee.

Thomas L. Cooper, Pittsburgh, for Planz, appellee at nos. 1391 and 103.

Before SPAETH, HOFFMAN and VAN der VOORT, JJ.

SPAETH, Judge:

These appeals are from an order denying motions for judgment n. o. v. or new trial in a trespass action. The action arose out of an accident that occurred on March 14, 1973 on Route 8 in Penn Township, Butler County, when a car being driven south by one Francis Piekarski collided head–on with a truck being driven north by one Raymond Planz. Both men died as a result of the accident.

The executrix of Piekarski's estate sued Club Overlook Estates, Inc., which owned land near Route 8; Phillip Fratto and Samuel Fratto, t/d/b/a Dino's Bar, an establishment adjacent to Route 8; Penn Township; and Latrobe Construction Co., which had done work on a residential site located on a hill overlooking Route 8. The executrix of Planz's estate sued the same parties and, in addition, Priscilla Piekarski, as Administratrix of the Estate of Francis J. Piekarski. The actions were consolidated for trial. Before the trial began, Latrobe Construction was dismissed as a defendant. After a lengthy trial, the jury returned large verdicts against Penn Township and Club Overlook; Dino's Bar and the Estate of Piekarski were exonerated. Penn Township and Club Overlook filed motions for judgment n. o. v. or new trial, which the lower court denied, and it is from that denial that these appeals have been taken.

–1–

*Penn Township's Motions*

(a)

The Motion for Judgment N. O. V.

█ In considering whether judgment n. o. v. should be entered in favor of Penn Township, we must regard the evidence, including all reasonable inferences arising from the evidence, in the light most favorable to appellees as the verdict–winners. *Miller v. Checker Yellow Cab Co.,* 465 Pa. 82, 348 A.2d 128 (1975); *Estate of Flickinger v. Ritsky,* 452 Pa. 69, 305 A.2d 40 (1973); *Kresovich v. Fitzsimmons,* 439 Pa. 10, 264 A.2d 585 (1970). So regarded, the evidence discloses the following.

Route 8 is a four–lane state highway that runs north and south. In the area where the accident occurred, Route 8 is bordered on its western side by property owned by the Frattos, who operate Dino's Bar. Prior to 1955, Dino's Bar was bordered on its western and southern sides by unimproved farm land. In 1955, Club Overlook bought a tract of 60 acres that included both the hill located behind Dino's Bar and the land on top of the hill. In 1955 and 1956, in order to prepare the tract for residential development, Club Overlook, through its President Kenneth Noell, Jr., supervised the construction of a street and drainage system on the top of the hill. Several surface drains, pipes, and ditches were installed, which directed drainage water to a 21–inch pipe located at the head of a gully that ran from the top of the hill down to Dino's Bar.

In 1956, Penn Township inspected the completed street and drainage system, and, at the request of Club Overlook, assumed maintenance and control of the system. Club Overlook retained ownership of the hillside on which the gully was located.

Two years later, the state enlarged Route 8 from a three–lane to a four–lane highway. The additional lane was placed on the western side of the highway and eliminated some of the parking area in front of Dino's Bar. To compensate for the loss, Dino's Bar enlarged its parking area in back by excavating part of the hillside; approximately 60 to 70 feet of the hillside was removed. Before the excavation there was a sewer located almost at the base of the hill; afterwards, however, the sewer was some 80 to 85 feet from the base of the hill. N.T. at 1,047, 11/16/76.

Phillip Fratto, owner of Dino's Bar, testified that he first experienced a flooding problem on his property after the street and drainage system had been constructed on top of the hill. Prior to the construction, the water in the gully behind his property was a little "crick," N.T. at 243, 11/9/76; afterwards his property was frequently flooded during rainstorms, N.T. at 240, 11/9/76, and gravel was washed out onto Route 8. N.T. at 244, 11/9/76. Fratto notified Penn

Township of his flooding problem several times. N.T. at 274, 11/10/76.

Two witnesses, Deana McDowell, who was travelling on Route 8 on the night of the accident, and Arthur Marks, who occasionally patronized Dino's Bar, testified that on several occasions they had observed flooding of Route 8 near the entrance of Dino's Bar. N.T. at 231, 11/9/76; N.T. at 1,145, 11/18/76.

Wilbert Mowry, chairman of the Board of Penn Township Supervisors, testified that he was aware of the drains and roads on the top of the hill and their location with respect to Dino's parking lot and Route 8. N.T. at 1,070, 11/17/76.

Samir George Khoury, a professor at the University of Pittsburgh with a background in geology and civil engineering, testified that the effect of the drainage system installed by Club Overlook was to increase the amount and speed up the flow of water from the land on the top of the hill, down the hillside, to Dino's Bar and Route 8. N.T. at 400, 11/9/76. He stated that the effect of the drainage system was to put a "funnel with the mouth of it collecting the water from a large area on the top and directing it then to a point at the base, which is the head of the gully." N.T. at 402, 11/9/76. He further stated that the drainage system did not dispose of the water properly because it "just lets it out of the head of the gully, and from there on it's just left to go on its own course where it eventually winds up." N.T. at 422–423, 11/9/76. He expressed the opinion that if the water from the hillside flowed onto the highway in a west–east direction and formed a six to ten foot arc of water, four inches in depth, a driver in the southbound lane might lose control of his vehicle and turn into the northbound lane. N.T. at 429, 11/9/76; N.T. at 431, 11/9/76. He considered the drainage problem to be easily detectable to a trained eye, and suggested that it could have been ameliorated by retarding the flow of water at the head of the gully, one way to do this being to install a drainage well there. N.T. at 435, 11/9/76: N.T. at 440, 11/9/76. He acknowledged that the three drains on the premises of Dino's Bar might handle the

water, if they were placed at the bottom of the hill instead of where they were, and the water from the gully was directly channeled into them and they were functioning properly, N.T. at 562, 11/12/76, but said that if he were designing the drainage system, he would not "take a chance with the amount of water coming from that hill." N.T. at 560, 11/12/76. He noted that on the day he visited Dino's Bar, the drain in back of it was not functioning because it was filled with gravel from the parking lot, N.T. at 552, 11/12/76, and suggested that this would be a continual problem because "of the large amount of water that the area was not properly defined to carry, it just clogged the drains." N.T. at 553, 11/12/76.

On the night of the accident, it was raining heavily. At approximately 10:30 p. m., Piekarski's car, which was travelling south at 40 to 45 m. p. h., when near the entrance to Dino's suddenly veered to the left, crossed into Planz's lane of traffic, and collided with his truck. N.T. at 179, 11/9/76. Several witnesses testified that there was a discharge of water onto Route 8 from the west side of the highway adjacent to Dino's parking lot, and that this water was four to six inches deep and three to four feet wide. N.T. at 229, 11/9/76; N.T. at 75, 11/8/76; N.T. at 149, 11/9/76. One eyewitness to the accident, Marsha Collins, located the concentration of water at the point where Piekarski's car made its abrupt turn into the northbound lane. N.T. at 184, 11/9/76. Another witness, Trooper Ronald Monoco, who arrived at the scene shortly after the accident, traced the water to the gully behind Dino's. N.T. at 77, 11/8/76.

■ Penn Township's first argument for judgment n.o.v. is that the lower court misstated its possible liability as an owner of the drains and streets on the land on top of the hill.[1] Penn Township argues that the lower court should not

1. Penn Township does not dispute the lower court's application of upper riparian cases to this case. Those cases have previously been applied only where an upper landowner injures a lower landowner, and not where, as here, an upper landowner injures a person travelling on the lower land. The lower court noted this about the upper riparian cases and then proceeded to apply them anyway. Since

have charged the jury that it could be liable if "the water [in Penn Township's drainage system] was diverted from its natural channel or where it is unreasonably or unnecessarily–where it is unreasonably or unnecessarily–changed in quantity." N.T. at 1,254, 11/19/76.

In *Leiper v. Heywood–Hall Construction Co.*, 381 Pa. 317, 320, 113 A.2d 148 (1955), the Supreme Court stated:

> "The owner of upper land has the right to have surface waters flowing on or over his land discharged through a natural water course onto the land of another, ... He may make proper and profitable use of his land even though such use may result in some change in quality or quantity of the water flowing to the lower land: ... From those rules it is clear that only where the water is diverted from its natural channel or where it is unreasonable or unnecessarily changed in quantity or quality has the lower owner received a legal injury." [quoting *Lucas v. Ford*, 363 Pa. 153, 155, 156, 69 A.2d 114, 116 (1949)].

. . . . .

> "It is only where the owner of the higher land is guilty of negligence which causes unnecessary damage to the servient owner, or where, by an artificial channel, he collects and discharges surface waters in a body or precipitates them in greatly increased quantities upon his neighbor, that the latter may recover for any damage thereby inflicted .... " [quoting *Chamberlain v. Ciaffoni*, 373 Pa. 430, 436, 437, 96 A.2d 140 (1953)].

The lower court's charge, it will be observed, was consistent with this standard. Penn Township argues, however, that this standard is not applicable to municipal upper riparian landowners. In *Rau v. Wilden Acres, Inc.*, 376 Pa. 493, 103 A.2d 422 (1954), the Court made the following statement, in *dictum* :

> Penn Township has not argued and briefed the significance, if any, of the difference between this case and the upper riparian cases (Club Overlook has done so, but very incompletely), we shall not discuss the issue. It should be noted, however, that whether or not Penn Township may be liable as an upper riparian landowner, it may be liable as a landowner maintaining a dangerous condition in "close proximity" to a highway. *See* pp. 1207–1208, *infra.*

> One [a landowner] may make improvements upon his own land, especially in the development of urban property, grade it and build upon it, without liability for any incidental effect upon adjoining property even though there may result some additional flow of surface water, thereon through a natural watercourse, but he may not, by artificial means, gather the water into a body and precipitate it upon his neighbor's property. *Even a municipality, while not liable. to a property owner for an increased flow of surface water over his land arising merely from changes in the character of the surface produced by the opening of streets and the building of houses in the ordinary and regular course of the expansion of the city, may not divert the water onto another's land through the medium of artificial channels.*

376 Pa. at 494–495, 103 A.2d at 423. (Emphasis added.) Penn Township reads this statement to mean that a municipal upper riparian landowner may *only* be liable where it diverts water from its natural channel, as opposed to a private landowner, whose liability, as stated in *Leiper v. Heywood–Hall Construction Co., supra,* extends not only to a case in which water "is diverted from its natural channel" but *also* to a case in which water "is unreasonably or unnecessarily changed in quantity or quality." If this is the proper reading of *Rau*, then the lower court should have granted judgment n.o.v. in favor of Penn Township, because the evidence suggested that while the drainage system collected the water and increased the quantity of its flow, it did not divert the water from its natural watershed; indeed, the lower court conceded as much at one point in its charge. N.T. at 1,265, 11/19/76. We have concluded, however, that *Rau* should not be read as Penn Township reads it.

As mentioned, the language in *Rau* on which Penn Township relies was *dictum.* In *Rau*, the facts were that the defendant, a private landowner, had diverted the natural flow of the surface water from its property by concentrating the water and sending it through an artificial channel, discharging it onto the plaintiff's adjoining land. Accord-

ingly, the Court had no difficulty in upholding the chancellor's decree enjoining the defendant, for settled authority established the impropriety of the defendant's conduct. So far as the present case is concerned, *Rau* is not in point, for it involved neither a municipal landowner nor a landowner who, while not diverting water from its natural channel, nevertheless unreasonably and unnecessarily changed the quantity of the flow of water onto his neighbor's land.

Of course, if the Court's *dictum* in *Rau* had been considered *dictum* in the sense of reflecting the Court's dissatisfaction with settled law, and expressing its desire to change the law, the *dictum* would be entitled to special consideration. Quite the contrary is the case, however; at the very outset of its opinion, the Court states that "[t]his controversy is concerned with facts rather than the law." 376 Pa. at 494, 103 A.2d at 423. The Court then summarizes the law, collecting the cases in a footnote.

Among the cases thus cited is *Strauss v. Allentown*, 215 Pa. 96, 63 A. 1073 (1906). There the Court held that "[t]here is no sound reason why the same rule should not apply to municipalities as to individuals." 215 Pa. at 98, 63 A. at 1073. Thus the Court rejected the argument made by Penn Township here, that its liability should be different from, and less comprehensive than, the liability of a private landowner.

Furthermore, when one considers what is the rule that thus applies to both private and municipal landowners alike, it becomes clear that the liability of both sorts of landowner extends not only to a case where the landowner has diverted water from its natural channel but also to a case where the landowner has unreasonably or unnecessarily changed the quantity or quality of the water. Thus in *Strauss v. Allentown, supra*, the Court stated that while the municipality was entitled to the natural development of its hillside without incurring liability, that was true only if the municipality acted without negligence. 215 Pa. at 99, 63 A. at 1073. And in *Pfeiffer v. Brown*, 165 Pa. 267, 30 A. 844 (1895), which is also among the cases cited in *Rau*, the Court stated that

while the upper riparian landowner has the right to the natural development of his property,

> This, as was shown in *Collins v. Chartiers Valley Gas Co.*, 131 Pa. 143 [18 A. 1012], does not go beyond proper use and unavoidable damage. It was accordingly said in the latter case that 'the use which inflicts the damage must be natural, proper, and free from negligence, and the damage unavoidable . . . . Hence, the practical inquiry is, first, whether the damage was necessary and unavoidable; secondly, if not, was it sufficiently obvious to have been foreseen, and also preventable by reasonable care and expenditure?'

165 Pa. at 273, 30 A. at 845.

We therefore find no error in the lower court's charge that Penn Township could be held liable if the jury found that it had unreasonably and unnecessarily changed in quantity the water flowing from its land onto Route 8.

Given the testimony of Khoury alone, a jury question arose as to whether the drainage system on the top of the hill unreasonably or unnecessarily increased the flow of the surface water. *See, e. g., Morton v. Borough of Dormont*, 334 Pa. 283, 5 A.2d 803 (1939).

■ Penn Township's second argument for judgment n.o.v. is that Khoury should not have been allowed to testify at all because his testimony was conclusory and beyond the scope of his pre–trial reports, in violation of Local Rule 212 of the Court of Common Pleas of Allegheny County. Penn Township claims that had the lower court properly excluded Khoury's testimony, appellees would not have made out a case against it.

Khoury testified that the drainage system "would speed up the flow [of water] and increase the amount that would reach the bottom of the hill," N.T. at 400, 11/10/76. In arguing that this testimony was objectionable because it was conclusory, Penn Township cites two cases in which the Supreme Court held that a layman's testimony that a vehicle was moving "fast" or "slow" or at an "excessive" speed was

too vague to have any evidentiary value. *See Starner v. Wirth,* 440 Pa. 177, 269 A.2d 674 (1970); *Layman v. Gearhart,* 389 Pa. 187, 132 A.2d 228 (1957), *overruled on other grounds, Smith v. Bell Telephone Co. of Pa.,* 397 Pa. 134, 153 A.2d 477 (1959). Khoury, however was an expert with a background in geology and civil engineering who explained his conclusions in the course of his testimony. He was unable to describe the change in the flow and speed of the water in any more exact terms because any calculation in terms of gallons of water or speed per hour was not practical. In the circumstances, therefore, the lower court did not err when it refused to exclude this testimony.

■ Nor did the lower court err when it refused to exclude Khoury's testimony that he had concluded that the drainage system did not dispose of the water properly, that this was obvious to the trained eye, and that the drainage problem could have been corrected, because these conclusions did not appear in his pretrial reports. Allegheny's County's Local Rule 212 provides in pertinent part:

Local Pretrial Procedure VI.

In all trespass actions, and in other forms of action to the extent this rule may be applicable:

A. Plaintiff within 30 days after notice of a pretrial conciliation conference as provided in Paragraph 2 hereof:

1) shall serve upon all parties a written statement containing:

d) the reports of any expert whose opinion will be offered into evidence at the time of trial. Such reports shall include the findings and conclusions of the expert.

In Khoury's first pre–trial report he stated:

There is a system of interconnected drainpipes and ditches on the higher grounds of Club Overlook Estates which help to drain the Estates and which probably contributes to the total west to east surface runoff that eventually reaches Rte. 8.

In his second pre–trial report, Khoury included a plot plan of Club Overlook Estates, "[s]howing the location of the system

of interconnected drain–pipes and ditches that facilitates and speeds–up the drainage of most of the Estates grounds." Although these statements did not explicitly set out the conclusions that Khoury testified to at trial, they did fairly indicate to Penn Township what Khoury's testimony was likely to be and that it might include all that was eventually given. The pre–trial reports included Khoury's central conclusion that the drainage system "probably contributes to the total west to east surface runoff that eventually reaches Rte. 8," which enabled Penn Township to present an appropriate rebuttal witness to contest this point and other points related to it. To exclude Khoury's testimony would have been an overzealous application of Rule 212. Indeed, *Gill v. McGraw Electric Company*, 264 Pa.Super. 368, 399 A.2d 1095 (1978), the one case Penn Township cites in support of its argument, is inapposite. There, we held that the lower court abused its discretion by permitting two expert witnesses to testify on behalf of a party that had violated a pre–trial order requiring it to identify the expert witnesses and disclose their opinions before trial. Here, by contrast, Penn Township was aware that Khoury was to testify and knew the substance of his testimony.

■ Penn Township's third argument for judgment n.o.v. is that the facts of this case did not justify the lower court in charging the jury on proximate cause.[2] It claims first, that the accident would have occurred even if there had been no increase in the flow of water, and second, that even assuming that the increase in flow could be considered a cause in fact of the accident, it was superseded as a matter of law by the Frattos' cutting the hillside behind Dino's Bar and the state's widening Route 8 without making proper provision for the flow of water under it.

Penn Township's first claim is without merit. Fratto testified that the improvements on the top of the hill in-

2. The terminology of "legal cause," used in the Restatement of Torts (Second) (1965), rather than the more traditional terminology of "proximate cause," has been adopted by the Supreme Court of this state. *Ford v. Jeffries*, 474 Pa. 588, 594, 379 A.2d 111, 114 (1977); *Whitner v. Von Hintz*, 437 Pa. 448, 263 A.2d 889 (1970).

creased the water coming down the gully and that as a result there was frequent flooding of his property. N.T. at 240, 11/9/76. Khoury testified that without the improvements on the top of the hill there would have been considerably less runoff flowing down the gully. N.T. at 581, 11/12/76.

Penn Township's second claim is also without merit. Our Supreme Court has adopted section 447 of the Restatement (Second) of Torts (1965) as defining the liability of a negligent actor where an intervening act of negligence has occurred. *Estate of Flickinger v. Ritsky, supra.* Section 447 states:

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>
> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
>
> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
>
> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

In interpreting this section of the Restatement, the Supreme Court has held:

> It is easily seen that this statement of the law, like the rules controlling the question of what conduct is negligent, presents *fact questions* of its own force. An intervening negligent act will not be a superseding cause relieving the original negligent actor from liability *if* that actor at the time of his negligent act *should have realized* that another person's negligence might cause harm; or, if *a reasonable man* would not regard the occurrence of the intervening negligence as *highly extraordinary*; or, if the intervening act is not *extraordinarily negligent.* What

the original actor should have realized and what a reasonable man would say was highly extraordinary are, of course, fact questions which must in the majority of cases be left to the jury.

*Estate of Flickinger v. Ritsky, supra,* 452 Pa. at 75, 305 A.2d at 43.

*See Ford v. Jeffries, supra; Miller v. Checker Yellow Cab Co. of Bethlehem, Inc., supra. See generally* Restatement (Second) of Torts § 453 (1965) (comment). Thus, whether the Frattos' and the state's conduct superseded the development of Club Overlook Estates as a cause of the accident was for the jury to decide.

## (b)

## The Motion for New Trial

■ Penn Township's first argument[3] for a new trial is that the lower court erred when it did not specifically instruct the jury that intervening acts of negligence on the part of the Frattos and the state may have superseded Penn Township's acts as a legal cause of the accident. When Penn Township excepted to this omission, the court replied by citing 3.28 of the Pennsylvania Proposed Standard Jury Instructions, which states that no instruction on superseding cause should be given.

The lower court's refusal to charge on superseding cause was proper in light of the fact that its general charge on causation adequately detailed the relationship between the various alleged acts of negligence. The lower court stated:

Now, under our law in order for the Plaintiff and you consider again each case individually–to recover in her case, the Defendant's negligent or careless conduct must have been a substantial factor in bringing about the accident. This is what the law recognizes as legal cause. A substantial factor is an actual, real factor, although the result may be unusual or unexpected; but it is not an imaginary or fanciful factor or a factor having no connec-

3. Strictly speaking, this is Penn Township's third argument; its first two arguments are repetitions of arguments for judgment n.o.v.

tion, or only an insignificant connection with the accident. It must be a substantial factor in producing the accident involved in these proceedings.

Now, there may be more than one substantial factor in bringing about an accident. When negligent or careless conduct of two or more persons contributes concurrently to an accident each of these persons is fully responsible for the accident regardless of the relative extent to which each contributes to the accident. A cause is concurrent if it was operative at the moment of the accident and acted with another cause as a substantially contributive factor in bringing about the accident. So you must find legal cause, but there may be concurring legal causes. In other words, there may be two causes operating at the time of the accident. Where the negligent or careless conduct of a Defendant combines with other circumstances and other forces to cause an accident the Defendant is responsible for the accident if his negligent conduct was a substantially contributive factor in bringing about the accident even if the accident would have occurred without it.

By instructing the jury so carefully on substantial factor and concurring cause, the lower court obviated the need for a separate instruction on superseding cause. Thus the Subcommittee note to 3.28 of the Proposed Standard Jury Instructions states:

[S]uperseding cause is defined by the Restatement of Torts, 2d, § 441(2) as being that intervening cause which *prevents* the defendant's negligence from being a substantial contributing factor in bringing about the accident. A subsequent act is *not* a superseding cause insulating the defendant from liability if the defendant's negligence was a substantial contributing factor to the accident, either by creating or increasing the risk of harm itself or by creating or increasing the risk of harm from subsequent acts of another.

Restatement of Torts, 2d, §§ 442A and 442B; *Ford v. Jeffries, supra.*

Penn Township's second argument for a new trial is that the lower court should not have charged that it could be liable as a landowner in "close proximity" to Route 8. Penn Township claims that the court should have defined "close proximity" for the jury; that the instruction could appropriately be applied only to landowners adjacent to Route 8; and that the instruction should not have been given since it was based in part on Restatement of Torts, 2d, § 368 (1965), which was not applicable to the facts of this case.

■ With respect to the first claim, we believe that the terminology the court used was sufficiently clear. At trial there was evidence that the crest of the hill on which Penn Township's drainage system was located was as close as 900 feet to Dino's bar sign which abutted Route 8, N.T. at 1,057, 11/17/76; this should have been enough for the jury to decide if Penn Township was in "close proximity" to that highway.

■ With respect to the second claim, the instruction was not rendered inappropriate by the fact that Penn Township was not adjacent to Route 8. In *Hudson v. Grace*, 348 Pa. 175, 180, 34 A.2d 498 (1943), the Supreme Court stated:

[O]ne who is in possession of land adjacent or in close proximity to a public highway must exercise reasonable care to avoid injury to the traveling public arising from unnecessarily dangerous conditions created by him on the land, where the consequences of a failure to do so are reasonably foreseeable.

■ The third claim is also without merit. Comment j to section 368 of the Restatement of Torts (Second) (1965), states that it does not impose an obligation on a landowner to remove a dangerous condition that existed at the time the highway was dedicated. Penn Township claims that since it took over the drainage and street system two years before Route 8 was widened, it cannot be liable under section 368. This argument fails to acknowledge that Route 8 was a highway *before* Penn Township took over the drainage and street system, and, therefore, that the township should have been aware of its duties to travellers on that highway.

■ Penn Township's third argument for a new trial is that the lower court should not have instructed the jury on several issues not presented by the evidence.

The court instructed the jury that it would have to consider whether Penn Township carelessly or negligently maintained the street and drainage system. According to Penn Township, there was no evidence that it had done so. However, Penn Township has read the court's charge too restrictively. It is true that there was no evidence that the drainage and road system had malfunctioned or had not performed in accordance with its original design; but there was a great deal of evidence that because of the drainage system, the discharge of an excessive amount of water on the land below had occurred. When the charge is considered as a whole, it is apparent that it was to this discharge that the lower court referred when it instructed the jury that it would have to consider whether the drainage system was negligently maintained.

■ The lower court also instructed the jury that one of the issues was whether "the water was diverted from its natural channel or whether it was unreasonably or unnecessarily changed in quantity." N.T. at 1265, 11/19/76. The court acknowledged that part of this charge–the reference to diversion from a natural channel–was unnecessary:

> Now, both parties agree–or all parties agree–that there has been no change in the watershed. The drainage, the watershed, the direction of flow remains the same after the drainage as it did before. So the crux, the point, is whether or not there was this unreasonable or unnecessary increase in the water supply.
> N.T. at 1,265, 11/19/76.

Apparently the lower court believed that it had to include this part since it is inseparable in the case law from the relevant language on unreasonable or unnecessary flow of water. As may be seen from our discussion of Penn Township's motion for judgment n.o.v., *supra*, it is true that in the cases the language on diversion is often stated in close

conjunction with the language on unreasonable flow. Any prejudice to Penn Township created by this part of the lower court's charge was immediately cured by the court's acknowledgment that there was no evidence of diversion in the case, and its explanation that "the crux" of the case was therefore "whether or not there was this unreasonable or unnecessary increase." The fact that the lower court repeated the water diversion instruction at one point later in the charge did not undo the effect of this earlier explanation. It is axiomatic that in deciding whether a charge was unduly prejudicial we must consider it in its entirety. *Osterriter v. Holl*, 259 Pa.Super. 112, 393 A.2d 742 (1978); *Stack v. Wapner*, 244 Pa.Super. 278, 368 A.2d 292 (1976).

■ Penn Township's fourth argument for a new trial is that the lower court failed to charge adequately on the duties of the Commonwealth and the Frattos. This argument is without merit. The court charged the jury that the Commonwealth had a duty to maintain Route 8 in a safe condition but that this duty was distinct from that of the nearby landowners to maintain their property in a safe condition. The charge was based on a correct reading of *McCarthy v. Ference*, 358 Pa. 485, 58 A.2d 49 (1948). Moreover, in at least three parts of the charge the lower court alluded to the Frattos' duty to travellers on Route 8. The court stated at one point:

> All right, now in addition to the Club Overlook and Penn Township, the water went through the property of the Frattos, which was the abutting owner on Route 8; and most of the discussion as to the Fratto property came from the testimony of witnesses in other Defendants' cases about changes that were made in the Fratto property after the drainage system was installed. And Fratto was the abutting owner on Route 8; the water went through his land; and the question is whether as a reasonable person he had a responsibility to do anything concerning the water.

N.T. at 1,264, 11/19/76.

█ Penn Township's fifth argument for a new trial is that the lower court erred when it did not charge the jury that there is an inference that a driver on the wrong side of the road is negligent. Such an instruction would have been inappropriate in this case. In *Fair v. Snowball Express, Inc.*, 226 Pa.Super. 295, 310 A.2d 386 (1973), this court stated:

> In "wrong side of the road" accidents, i. e., where one car suddenly enters the lane of oncoming traffic and an accident occurs, it is too great a burden to make the injured party prove that the defendant's act was a result of his negligence and would often result in the defendant's unjustly escaping liability. To avoid this inequitable result, our courts have held that unless the defendant can explain his presence in the wrong lane, negligence can be inferred.
>
> (Citations omitted).

Here, there was no lack of explanation as to why Piekarski's car was in the wrong lane; it was there because of an accumulation of water on Route 8.

Penn Township's final argument for new trial is that the charge taken as a whole was unduly prejudicial. Since this argument is merely a restatement of Penn Township's prior criticisms of the charge, it requires no discussion.

–2–

Club Overlook's Motions

(a)

The Motion for Judgment N.O.V.

Our disposition of Penn Township's arguments in support of a judgment n.o.v. controls similar arguments made by Club Overlook. The lower court's denial of Club Overlook's Estates, Inc.'s motion for judgment n.o.v. will therefore be affirmed.

## (b)

## The Motion for New Trial

 Club Overlook's motion for new trial must be granted because the lower court misstated the extent of its liability.[4]

The lower court charged the jury:

Now, there is one additional distinction that you the jury are going to have to make in these proceedings as to the status of the landowners, and that is that the drainage system was constructed by Club Overlook, and it was then dedicated to and accepted by the Township of Penn in 1956. From 1956 to the date of the accident the responsibility for the maintenance of this particular system would have fallen on the Township of Penn. The streets were dedicated to the Township; and under the various laws that surround this, upon dedication the municipality assumes the responsibility. However, to the extent that Club Overlook retained ownership of portions of the property–and at the time of the accident Club Overlook owned approximately 11 and a half acres–and to the extent that the water, as directed by the drainage system, flowed over the Club Overlook's property which it retained, Club Overlook had the responsibility of the maintenance of that portion of the water that was flowing over their property.

In addition, while Club Overlook is relieved from responsibility for the maintenance of the system after it was turned over to the Township–in other words, after it was dedicated to the Township Club Overlook was no longer the possessor of the land, which were the streets of the

---

4. There is no impropriety in granting one defendant a new trial but not the other. *See* Goodrich–Amram 2d § 2231(d):6(1977). Goodrich–Amram states:

> [I]f the court makes an error of law respecting the liability of one defendant which justifies a new trial, the verdict in favor of the defendant as to whom there was no error should remain. The new trial should be entered only as to the defendant with respect to whom the error was committed.

Goodrich–Amram 2d § 2231(d)(6)(1977).

*See also Denton v. Michel's Bakery Co.*, 363 Pa. 502, 70 A.2d 284 (1950).

development, and the responsibility shifted to the Township–Club Overlook retained a responsibility for any initial careless design of the drainage system. In other words, in determining the liability of Club Overlook you must take into consideration that the maintenance shifted to the Township in 1956 and that as to maintenance this responsibility was limited to that portion of the property which they retained; but they did retain a responsibility as to any carelessness or negligence in the initial construction.

The members of the jury were obviously concerned with this portion of the charge because after the lower court had concluded the entire charge, they asked the lower court to restate the law "as it pertains to Club Overlook Estates' liability as developers of the road and drain system." N.T. at 1,312, 11/19/76. The lower court refused to do this because it thought it might be unduly prejudicial to Club Overlook.

The lower court should not have injected the issue of Club Overlook's possible liability as developer of the road and drainage system. The law is clear that any negligence of Club Overlook in designing or constructing the road and drainage system was cured by its dedication of the system to Penn Township. *McCarthy v. Ference, supra; Slivka v. Ference*, 353 Pa. 339, 45 A.2d 40 (1946); *Smith v. Pennsylvania R.R. Co.*, 201 Pa. 131, 50 A. 829 (1902).

[A]n owner who dedicates a way to the public neither warrants nor represents that the land is fit for the purpose, but the public takes it as it is granted, and in the condition in which it is at the time of the dedication. McQuillin, 11 *The law of Municipal Corporations* § 33.66 (3rd ed. 1949).

The lower court's emphasis on the fact that Club Overlook had retained ownership of the land on which the gully was located was misplaced. In *McCarthy v. Ference, supra*, some people were killed when the bus in which they were travelling was hit by a boulder from a hillside adjoining the highway. The defendants had located and constructed the highway and had dedicated it to a local municipality, but had retained ownership of the hillside. The Court observed

that the defendants could not be liable for any negligence in the location or construction of the highway, but could be liable for any negligence in not maintaining the hillside properly. 358 Pa. at 493, 58 A.2d at 493. Likewise, Club Overlook's retention of the land on which the gully was located might be a basis for liability, but it could not undo its exoneration for any negligence in the design and construction of the road and drainage system.

Furthermore, Club Overlook could not be held liable for the road and drainage system, because of the Act of December 22, 1965, P.L. 1183, § 1, 12 P.S. § 65.1 (Supp.1977),[5] which states in pertinent part:

"§ 65.1 Twelve years

No action (including proceedings) whether in contract, in tort or otherwise, to recover damages:

(1) For any deficiency in the design, planning, supervision or observation of construction or construction of an improvement to real property,

5. See Act of July 9, 1976, P.L. 586, No. 142, § 2, as amended, Act of April 28, 1978, P.L. 202, No. 53, § 10(63.1), 42 Pa.C.S.A. § 5536 (Purdon's Pamphlet 1979). Club Overlook has not waived this argument below. Although it did not plead the Act of 1965 in its original answer to the complaint, it petitioned the lower court for leave to amend its answer to include this defense. The lower court denied the petition for reasons entirely unrelated to the merits of the defense. "In the absence of a proper and compelling ground for refusing an amendment, the court should grant leave to amend [a pleading]. Its refusal to do so, under some circumstances, is an abuse of discretion which is reversible on appeal." Sheppard v. First Pa. B. and T. Co., 199 Pa.Super. 190, 193, 184 A.2d 309, 311 (1962). Even if the lower court did not abuse its discretion in denying the petition, it is not clear that Club Overlook need have raised the issue in the pleadings. The parties and the court below conceded that the Act of 1965 was a statute of repose, in other words, that it disallowed a cause of action unless asserted in conformance with the statute's provisions. In other cases, when a party has raised a statute of repose at trial, the failure to plead the statute specifically in the answer has not been a bar to its consideration. See First P.G.C. Co. v. Wheeler R.C. Co., et al., 301 Pa. 485, 152 A. 685 (1930); Overmiller v. D.E. Horn & Co., Inc., 191 Pa.Super. 562, 159 A.2d 245 (1960). Consideration of the statute, moreover, would comport with Pa.R. Civ.P. 1032, which states that the defense of failure to state a claim upon which relief can be granted is not waived even though not presented in preliminary objection, answer, or reply.

(2) For injury to property, real or personal, arising out of any such deficiency,

(3) For injury to the person or for wrongful death arising out of any such deficiency, or

(4) For contribution or indemnity for damages sustained on account of any injury mentioned in clauses (2) and (3) hereof shall be brought against any person lawfully performing or furnishing the design, planning, supervision or observation of construction, or construction of such improvement more than twelve years after completion of such an improvement.

* * * * * *

§ 65.4 Defense by person in possession or control of improvement

The limitation prescribed by this act shall not be asserted by way of defense by any person in actual possession or the control, as owner, tenant or otherwise, of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury or death for which it is proposed to bring action.

The lower court acknowledged that Club Overlook "had designed a road system with a drainage system attached to the roads," but did not believe that the statute exonerated Club Overlook because it had retained ownership of the land containing the gully. Again, this was error. Section 65.4 of the statute denies its protection only to a party that retains possession or control of an *improvement* at the time of the deficiency. Here, it is undisputed that at the time of the accident, Club Overlook had not retained possession or control of the road and drainage system; its retention of the gully was irrelevant to the application of the Act.

One further observation is required. Although Club Overlook's possible negligence as a developer of the road and drainage system may not be an issue in the retrial of this case, its possible liability as a negligent landowner in "close proximity" to the highway may be. As pointed out previously, this claim of liability is based on Section 368 of the Restatement of Torts (Second), which limits liability to a

landowner whose property contains an "artificial" condition that is dangerous to travellers. Section 368 does not define "artificial" condition, but comment b to Section 363 defines a "natural condition of land" as one "[that] has not been changed by any act of a human being, whether the possessor or any of his predecessors in possession, or a third person dealing with the land either with or without the consent of the then possessor." Here, a jury could find that the gully on Club Overlook's land was altered in character by the installation of the road and drainage system on the top of the hill, and, therefore, that the gully was no longer in its natural condition. Indeed, in *Clarke v. Edging*, 20 Ariz. App. 267, 512 P.2d 30 (1973), the court held that the jury could have found that an eroded gully was an artificial condition, given the expert testimony that the erosion was probably created by the irrigation or run–off from irrigation of an adjoining field.

The order of the lower court is reversed insofar as it denies the motion by Club Overlook Estates, Inc., for a new trial; otherwise the order is affirmed.